Daniel E. Sobelsohn (CSB No. 181212)
daniel@sobelsohnlawfirm.com
THE SOBELSOHN LAW FIRM
21550 Oxnard Street
Suíte 480
Woodland Hills, CA 91367
Tel: (818) 722-8995

(*additional counsel on the signature page)*

Attorneys for Plaintiffs

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| ANTHONY SMITH, ROBERT DUNLAP, and MIGUEL SOTO, individuals, on behalf of themselves and all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>DJI TECHNOLOGY, INC., a California Corporation,<br><br>Defendant. | Case No. 2:25-cv-9941<br><br>**CLASS ACTION COMPLAINT**<br><br>**DEMAND FOR JURY TRIAL** |

Plaintiffs Anthony Smith, Robert Dunlap, and Miguel Soto, by their attorneys, make the following allegations and claims for their complaint against DJI Technology, Inc. ("DJI" or "Defendant"). The following allegations are made upon information and belief, except as to the allegations that pertain to Plaintiffs, which are made upon knowledge.

## PRELIMINARY STATEMENT

1. This is a consumer class action seeking damages and equitable relief on behalf of Plaintiffs and on behalf of all others similarly situated in the United States who purchased the DJI Action 2 camera (hereinafter referred to as the "Camera(s)"), which suffers from a defect that causes the camera to overheat and shut down after just a few minutes when used as intended to record video in 4K.

2. The Camera, pictured below, is a highly compact wearable "action camera" that DJI advertises as capable of recording fast-paced action video in the ultra-high definition "4K" video standard at a rate of 120 frames per second, with sufficient battery life and memory to record for more than an hour using just the internal battery.




3. The compact size of the Cameras, coupled with the claimed ability to record video in 4K and do so at a high frame rate, are material specifications of the Cameras for which DJI charges a price premium, and are integral parts of the basis of the

bargain for consumers purchasing them.

4. DJI's representation that the Cameras can be used to record video content in 4K is materially false and misleading because the Cameras suffer from an inherent defect (the "Defect") that causes the Cameras to overheat and shut down after just a few minutes of 4K recording -- which is not even close to the advertised recording time of 70 minutes to 180 minutes based on the capacity of the battery. Essentially, rather than the recording capability in 4K being limited by the camera's battery life – which is what a reasonable consumer would expect -- it is instead limited by the camera overheating and shutting down after just a few minutes of use.

5. When the Camera overheats after just a few minutes of recording in 4K, the firmware causes the Camera to shut down to protect its delicate internal components from damage due to excessive heat. The firmware also prevents the camera from being powered on again until it cools down, which can take up to 10 minutes. A consumer attempting to use the Camera to record in 4K/120 fps — the advertised specification for the Camera — would find that it becomes so hot to the touch that it is difficult to handle with bare hands after just a few minutes of recording, and then shuts down without warning. A consumer hoping to record fast-paced action with the DJI "action" camera can only record for a few minutes before having to wait for the camera to cool down sufficiently to be restarted, which renders the Camera useless for recording in 4K/120 fps.

6. The Defect renders the Cameras unsuitable for recording video content in 4K, and DJI's representations that the Cameras can be used to record video content in 4K are false and misleading to reasonable consumers.

7. Implicitly acknowledging the Defect and its inability to provide a countermeasure to address the Defect, DJI has stopped selling the Cameras in the United States and no longer sells a highly compact "action camera" with the same form factor as the Cameras.

8. Plaintiffs and the proposed class have suffered damages because they paid a premium for an ultra-compact wearable camera that was to be capable of recording in 4K/120 fps, with capabilities that are of little or no practical use due to the Defect. Plaintiffs and the Class would not have purchased the Cameras or would not have paid as much for them had DJI disclosed the Defect.

## PARTIES

**Plaintiff Anthony Smith**

9. Plaintiff Anthony Smith is a resident of Broomfield, Colorado, and a citizen of the State of Colorado. Mr. Smith purchased two Cameras, which were sold as a "bundle" with the DJI Dual-Screen Combo and Front Touchscreen accessories that can only be used with the Cameras. He paid $577.98 each. Mr. Smith purchased his first Camera in December 2021 and his second Camera in January 2022, both from Best Buy, an authorized retailer of DJI products.

10. Mr. Smith purchased the Cameras to create 4K video content, to capture footage with his aerial drones, and to produce content for his YouTube channel. Due to the Defect, he was unable to use the Cameras as he intended.

11. In purchasing the Cameras, Mr. Smith relied upon the representations relating to the cameras' ability to shoot 4K video content. When Mr. Smith's cameras manifested the Defect by overheating and shutting down when recording in 4K, he

returned them to Best Buy and used the credit he was provided to buy two identical Cameras.

12. When the replacement units also manifested the Defect, Mr. Smith again sought warranty remediation from Best Buy and used the credit he was provided to purchase *two more* identical Cameras. But these cameras also suffered from the Defect.

13. Having owned and used six separate cameras, all of which suffered from the Defect, Smith came to understand that the Defect was inherent in the Cameras and that replacing his cameras again would not solve the problems he was experiencing. Unable to use the Cameras as he had intended and consistent with the capabilities represented by DJI, Mr. Smith considered selling the Cameras, but decided it would be wrong to do so given the existence of the Defect.

14. The Defect renders the Cameras unsuitable and unusable for Mr. Smith's intended use, which was consistent with the represented capabilities of the Cameras. Had Mr. Smith known that the Cameras could only record video in ultra-high definition for a few minutes before overheating, becoming hot to the touch, and shutting down, he would not have purchased Cameras or would not have paid as much as he did.

**Plaintiff Robert Dunlap**

15. Plaintiff Robert Dunlap is a resident of Bristol, Connecticut, and a citizen of the State of Connecticut. Mr. Dunlap purchased two Cameras online. Mr. Dunlap purchased the DJI Action 2 Dual-Screen Combo from Drone Nerds in January 2022 for $519.00, plus an additional $19.00 for the DJI Action 2 Magnet Adapter Mount and $36.00 for the DJI Care Refresh 2-Year Plan. Mr. Dunlap also purchased a Dual Screen Combo Camera from Amazon.com in August 2024 for $181.82.

16. In purchasing the Cameras, Mr. Dunlap relied upon the representations relating to the cameras' ability to shoot 4K video content. Mr. Dunlap used his cameras mounted on a helmet or headband to shoot 4K video content primarily related to bicycles and bicycling, which was consistent with the advertised and intended use of the cameras as a wearable "action camera" capable of recording sports activities in 4K resolution. Due to the Defect, he was unable to use the Cameras as he intended. The cameras would overheat and shut down after just a few minutes of recording in 4K resolution.

17. The Defect renders the Cameras unsuitable and unusable for Mr. Dunlap's intended use, which was consistent with the represented capabilities of the Cameras. Had Mr. Dunlap known that the Cameras could only record video in 4K for a few minutes before shutting down, he would not have purchased them or would not have paid as much as he did.

**Plaintiff Miguel Soto**

18. Miguel Soto is a resident of Yonkers, New York, and a citizen of the State of New York.

19. Mr. Soto purchased two Cameras, the first directly from DJI from its online store in 2023, and the second from Amazon in 2024.

20. In purchasing his Cameras, Mr. Soto relied upon the representations relating to the Cameras' ability to shoot 4K video content. Mr. Soto primarily used his cameras to shoot 4K video content using aerial drones, which was consistent with their intended use. Due to the Defect, his cameras overheated and shut down, and he was unable to use the Cameras as he intended. Mr. Soto was often frustrated when reviewing his video content and finding that he had captured only a few minutes – and sometimes

less than a minute – of a flight he was trying to record, because his Cameras overheated.

21. Mr. Soto complained about the Defect to DJI using the online chat feature of its website, but DJI failed to respond. The Defect renders the Cameras unusable for Mr. Soto's intended use, which was consistent with the represented capabilities of the Cameras, and forced him to purchase alternate cameras to use in place of the DJI Cameras. Had Mr. Soto known that the Cameras could only record video in ultra-high definition for a few minutes before shutting down, he would not have purchased them or would not have paid as much as he did.

**Defendant DJI**

22. DJI is a California Corporation based in Los Angeles, California. DJI designed, manufactured, and marketed the Cameras containing the Defect and purposefully caused them to be placed into the stream of commerce within this District and throughout the United States.

## JURISDICTION AND VENUE

23. This Court has jurisdiction over all causes of action asserted herein pursuant to 28 U.S.C. §1332(d) because the aggregate claims of the Class exceed the sum or value of $5,000,000.00, and there is diversity of citizenship between proposed class members and defendant, and over supplemental state law claims under 28 U.S.C. § 1367. Venue is proper in this District under 28 U.S.C. §1391(a)(1) and (2). As set out below, DJI's headquarters is in Los Angeles County. DJI conducts substantial business in this District, including conduct directed at members of the Class, including the promotion, sale, and marketing of their products, sufficient to render it within the jurisdiction of this Court. The events and conduct giving rise to the claims in this action constitute interstate commerce, and a significant portion thereof occurred in this District.

## STATEMENT OF FACTS

**DJI Inaccurately Represents that the Cameras are Suitable for Recording Video Content in 4K.**

24. The DJI Action 2 camera was first sold in the United States in 2021.

25. DJI advertised the Camera as a compact "4K" camera capable of recording video content in 4K resolution at up to 120 frames per second (fps). This representation appeared on the box and in marketing materials, including the FAQ section of the DJI website.

26. In addition, DJI advertised the Camera's battery life as being no less than 70 minutes with the included internal battery, and that it could be extended to three hours with the addition of DJI's "Front Touchscreen Module" or "Power Module," reasonably implying to consumers that the Cameras could operate for these lengths of time.

27. Furthermore, as indicated by the use of the word "Action" in the name and description of the product, the Cameras were represented as being suitable for capturing "action" scenes, such as sporting activities, in 4K at 120 fps.

28. In DJI's launch video promoting the Camera, one of the first features mentioned was the Camera's 4K capability:

(voiceover)
"This is DJI Action 2."



(voiceover cont.)

"Action 2 doesn't just challenge design standards; it shatters them.

It harnesses size-defying power and adapting shooting for show stopping footage."

(voiceover at 27 seconds)

"With 4K/120 frame per second capabilities and an ultra-wide field of view, you can capture richer details and see more in every frame."




29. The specifications on DJI's website also warranted that the Camera could be used to capture video content in 4K:

| | |
|---|---|
| Video | 4K (4:3): 4096×3072 @ 24/25/30/48/50/60fps<br>4K (16:9): 3840×2160 @ 100/120fps<br>4K (16:9): 3840×2160 @ 24/25/30/48/50/60fps<br>2.7K (4:3): 2688×2016 @ 24/25/30/48/50/60fps<br>2.7K (16:9): 2688×1512 @ 100/120fps<br>2.7K (16:9): 2688×1512 @ 24/25/30/48/50/60fps<br>1080p (16:9): 1920×1080 @ 100/120/200/240fps<br>1080p (16:9): 1920×1080 @ 24/25/30/48/50/60fps |

30. DJI also represented on the product box that the Camera was suitable for recording video content in 4K at a rate of up to 120 frames per second:




31. To justify the price premium charged for the Cameras, DJI highlighted the Cameras' 4K/120 fps capability and its use as an "action" recorder, as an improvement over the less expensive prior model, the DJI Osmo Action Cam.

32. DJI marketed the Camera as suitable for recording fast-moving, live-action video content in 4K/120 fps, using videos of sports, racing cars, skydiving, and other action scenes. On DJI's website, DJI touts the ability to "[C]apture life on the go. From parkour to park walks, break the mold with DJI Action 2."




33. This preceding statement from the DJI website is placed just above one of the representations about the Cameras' 4K/120fps specifications. Reasonable consumers were left with the impression that they could capture video content of action scenes in 4K/120fps and obtain clear video despite the speed and motion of the subject being filmed.

34. DJI's representations were false and misleading, as it failed to disclose material facts concerning the ability of the Cameras to record in 4K. Due to the Defect, the Cameras can only record in 4K for a few minutes before overheating and shutting down. Not only does DJI not disclose this limitation, but DJI concealed the Defect by explicitly promoting how the Cameras' battery life and memory capacity allow long recording times, which are not possible due to the Defect. Specifically, DJI represented that the Cameras have a battery life of up to 70 minutes with just the internal battery, implying that this was the principal limitation on capturing video content. In fact, the limit on recording time is the Defect that causes the cameras to shut down after just a few minutes of recording in 4K.

**Battery**

| | |
|---|---|
| Type | LiPo 1S |
| Capacity | 580 mAh |
| Energy | 2.23 Wh |
| Voltage | 3.85 V |
| Operating Temperature | 0° to 40° C (32° to 104° F) |
| Charging Temperature | 5° to 60° C (41° to 140° F) |
| Operating Time | 70 minutes<br>* Tested in a laboratory environment while recording 1080p/30fps (Power Reserve) video with electronic image stabilization disabled. This figure should be used for reference only |

35. Further, DJI typically sells the Cameras in a package with either the Front Touchscreen Module or Power Module, both of which can only be used with the Cameras, and as shown below, DJI represents that these accessories increase battery life to between 160 and 180 minutes, implying that the limit on recording time was the battery capacity, not the overheating caused by the Defect:

## Double Down on Your Creativity

Snap on the Front Touchscreen Module and make yourself the center of attention. Designed with vloggers in mind, the front-facing OLED touchscreen and 4-mic Matrix Stereo let you compose videos and capture crisp audio as you narrate your adventures. And when connected, Action 2's battery life is increased to a maximum of 160 minutes when filming. [4]

Some things just click!

Power Module

## A Boost When You Need it Most

Did somebody say power couple? Get more out of your Action 2 with the Power Module. When connected, Action 2 gains a microSD card slot and can film for up to 180 minutes. [4] It's even hot-swappable, so you can keep filming without missing a beat.

36. DJI also reinforces its misrepresentations regarding the maximum operating time of the Camera through its assertions on the box, product literature, and marketing materials that tout the Camera's extensive memory capacity. In addition to promoting the long battery life, DJI emphasizes that the Cameras can accept SD memory cards with a capacity of up to 256GB, which are "hot-swappable," allowing consumers to record for hours without interruption by simply swapping out memory cards. The Defect, however, renders it impossible for consumers to operate the Cameras for anything approaching the hours of recording time promised by DJI when recording video content in 4K.

37. Despite DJI's representations, the Cameras cannot record video content in 4K/120 fps in a manner that is consistent with the expectations of a reasonable consumer. While the Cameras are marketed for recording sports and scenes involving action in 4K/120fps (hence the name "Action Cam"), the Defect renders the Cameras unsuitable

for such uses and non-compliant with the representations and warranties made by DJI.

38. The Defect was material and deprived Plaintiffs of the benefit of their bargains with DJI, which was an ultra-compact camera capable of recording 4K video, with the limitation on recording time determined by battery life and memory capacity, not the overheating caused by the Defect. When the Plaintiffs attempted to use their cameras to record video in 4K, they would find they only had a few minutes of video before the cameras shut down, causing them to miss the action they were attempting to record with their "action camera."

**The Defect**

39. When recording video content in 4K/120fps, the Defect causes the DJI Action 2 to rapidly overheat and shut down, usually in about three minutes – and often less -- well short of the hours of recording time promised, based on battery life and memory capacity. Even at lower frame rates, efforts to record in 4K can cause the Cameras to quickly overheat and shut down without warning after a short time, rendering them useless for 4K recording. Once the Camera overheats, it must be shut down for an extended time, usually at least 10 minutes, to cool off before it can be used again.

40. In addition to shutting down without warning, as shown below, the Cameras will become so hot to the touch that they cannot be held with a bare hand without the risk of injury. Indeed, videos online show that the Cameras, when used in 4K to the point of overheating, get hot enough to melt a slice of cheese.[1]

[1] https://www.youtube.com/watch?v=DwCC6soRT1M&t=419s (last visited on Sept. 22, 2025).



**DJI's Purported "Fixes" Do Not Work and Decrease the Expected Useful Life of the Cameras.**

41. The Cameras contain internal software known as "firmware," which causes them to shut down automatically when they reach a specified temperature. This prevents damage to delicate electronic components in the Cameras from excessive heat, and also avoids the risk of fire from exposing the rechargeable lithium batteries to high temperatures.

42. This automatic shutdown feature is also intended to protect users from injury from coming into contact with the hot surfaces of the Cameras and to comply with product safety regulations and standards.

43. DJI had actual notice of the Defect shortly after releasing the Cameras for sale in the United States from consumer complaints that the Cameras could not record content in 4K for meaningful amounts of time before shutting down. DJI's notice and awareness of the Defect is demonstrated by its release in November 2021, just a few months after the Cameras were first sold in the United States, of its first firmware update that allowed the Cameras to operate at higher temperatures before shutting down. This update, which allowed the Cameras to operate at a higher temperature before shutting down, likely compromised the expected useful life of the Cameras by exposing the battery, sensor, and other internal components to excessive heat for a longer time period.

44. However, even under ideal conditions, the firmware update only increased recording time marginally, while risking damage to the battery, sensor, and other internal components. As a result, the Cameras still failed to comply with DJI's representations and warranties and remained unsuitable for recording 4K video.

45. Conceding that the first firmware update failed to correct the Defect, in March of 2022, DJI tried to further mitigate the Defect in its Cameras by offering existing and future customers a plastic case for the Cameras, shown below, which DJI represented would increase recording time before overheating:



## Record Longer Than Ever

### DJI Action 2 Magnetic Protective Case

The DJI Action 2 Magnetic Protective Case helps prevent damage to the Camera Unit from impacts, scratches, and abrasions. An additional case is compatible with the Front Touchscreen Module and Power Module. Comprised of a heat-resistant polymer, the Magnetic Protective Case also helps reduce surface temperature to optimize video recording by activating a heat control solution that increases recording length under normal conditions.

### Technical Principles

The DJI Action 2 Camera Unit is made of metal material for fast heat dissipation of internal components, causing it to feel hot to the touch after long recording times. DJI Action 2 has a built-in temperature threshold system that automatically sends a prompt and stops recording when the camera temperature reaches a set value. The Magnetic Protective Case is made of a heat-resistant polymer to make the Camera Unit less restricted by temperature, allowing extended recording times under normal conditions.

46. The DJI product page on Amazon.com also describes the case as increasing recording time:

- Magnetic Protective Case - Prevents damage from impact, scratches, and abrasions. Heat resistant to increase recording length under normal circumstances.

47. The Magnetic Protective Case was designed to protect consumers from the excessive heat generated by the Defect and to enable the Cameras to operate at higher temperatures before shutting down. However, DJI's tests confirm that the actual effect on recording due to the case was minimal and certainly not enough to render the Cameras suitable for recording in 4K/120fps.

48. These countermeasures do not increase the 4K/120 fps recording time to comply with DJI's representations and warranties and allow the cameras to record video content in 4K/120fps in any meaningful sense, but the slight increase in recording time attributable to the countermeasures comes at the expense of long-term durability of the Cameras. One of the reasons the software in the Cameras shuts the Cameras down when

the operating temperature exceeds a certain threshold is that excessive heat can damage and cause premature wear to the delicate electronic components in the Cameras. By changing the firmware to allow the Cameras to run at higher temperatures, DJI has marginally increased recording time but done so at the expense of the long-term durability of the Cameras. Because the Cameras now run hotter before shutting down, the internal components that must be protected from excessive heat can be expected to fail more quickly.

49. Moreover, the Protective Case, while doing nothing to address the Defect or adequately extend 4K recording time, makes the Cameras much larger than they were designed or represented to be, eliminating the compact size, which was an essential basis of the bargain for consumers in purchasing the Cameras and paying a price premium for the Cameras.

50. By repeatedly making false claims that it had countermeasures to fully address the Defect, DJI sought to intentionally conceal the ongoing existence of the Defect to dissuade owners of the Cameras from asserting claims against DJI, and induce prospective consumers to purchase the Cameras. Indeed, Mr. Smith twice exchanged his Cameras for new Cameras, expecting that the Defect had been addressed.

**DJI's Knowledge of the Defect and Price Premium**

51. Although DJI had actual notice of the Defect and the Cameras' inability to perform and record video content at their represented specifications since the time the Cameras were first sold to consumers in the United States - as evidenced by multiple attempts to fix, mitigate, or otherwise address these deficiencies as discussed above -- DJI omitted any reasonable disclosure that the Cameras are, materially unsuitable for recording in 4K because the Defect will cause them to overheat and shutdown

prematurely. Instead, DJI has continued to market the Cameras as suitable for recording in 4K at frame rates as high as 120 frames per second, even though it was served with a Notice and Demand under the California Consumer Legal Remedies Act, dated April 11, 2023, concerning the Defect.

52. Nor has DJI disclosed that its purported software "fix" has come at the expense of long-term durability. If repeatedly and regularly used to the point of overheating, for example, by recording just a few minutes of 4K video, the Cameras will have a shorter expected useful life.

53. At this point, DJI has implicitly acknowledged that it cannot provide a countermeasure to meaningfully address the Defect by stopping sales of the Cameras in the United States. Indeed, implicitly recognizing that the compact form factor of the Cameras makes them, especially susceptible to overheating, DJI longer sells any cameras with 4K capability with the highly compact form factor as the Cameras.

54. Because of DJI's representation that the Cameras are capable and suitable for recording video in 4K at frame rates as high as 120 frames per second, they were sold at a substantial price premium to other compact cameras, including other non-4K cameras sold by DJI and its competitors.

55. Had DJI disclosed the Defect and the resulting limitations on the capability of the Cameras that renders them incapable of performing as represented, Plaintiffs and other consumers have been denied the benefits of their bargains with DJI and would not have purchased the cameras or would have paid less for them. As such, Plaintiffs and the Class are entitled to refunds or the price premium they paid for a 4K/120 fps camera.

## CLASS ACTION ALLEGATIONS

56. Plaintiffs bring this action on behalf of themselves and all other members of a class consisting of all purchasers of the Cameras (including purchasers who purchased the Cameras in a package with the Front Touchscreen Module or the Power Module) in the United States (the "Class"). Excluded from the Class are Defendant and any person, firm, trust, corporation, or other entity related to or affiliated with Defendant, including, without limitation, persons who are directors of DJI.

57. The Class is composed of at least thousands of persons nationwide and is sufficiently numerous for class treatment. The joinder of all Class members individually in one action would be impracticable, and the disposition of their claims in a class action will substantially benefit the parties and the Court. Plaintiffs' claims are typical of the claims of the Class, and Plaintiffs have no interests adverse to the interests of other Class members.

58. This dispute raises questions of law and fact common to all Class members. These common questions predominate over questions that arise on an individual basis for Class members. The common questions of law and fact include, without limitation:

(a) Whether DJI's representations, omissions, and conduct regarding the Cameras were misleading or false;

(b) Whether DJI's representations and conduct were likely to deceive consumers into believing that the Cameras were suitable for recording in 4K/120 fps;

(c) Whether DJI sought to conceal the existence of the Defect;

(d) Whether the Defect constitutes a manufacturing or design defect;

(e) Whether the Defect constitutes a breach of DJI's warranties and representations;

(f) Whether a reasonable consumer would be misled by DJI's representations that the Cameras could record video content at 4K/120 fps;

(g) Whether DJI violated California Business & Professions Code §17200, et seq., §17500, et seq., and California Civil Code §1750, et seq., and §1792, et seq.;

(h) Whether DJI's actions as described herein violated the consumer protection laws of California, Colorado, Connecticut, New York, and other states;

(i) Whether the members of the Class have been injured by DJI's conduct;

(j) Whether the members of the Class have sustained damages and whether DJI was unjustly enriched at their expense;

(k) The proper measure and appropriate formula to be applied in determining damages and restitution for the Class; and

(l) Whether the members of the Class are entitled to injunctive relief.

59. Plaintiffs will fairly and adequately protect the interests of the Class and have retained counsel experienced and competent in the prosecution of class action litigation.

60. A class action is superior to other methods for the fair and efficient adjudication of the claims herein asserted. Plaintiffs do not anticipate any difficulties in managing this class action.

61. A class action will permit many similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without the duplication of effort and expense that numerous individual actions would engender. Class treatment also will permit the adjudication of relatively small claims by many Class members who could not otherwise afford to seek legal redress for the wrongs complained of herein.

62. If a Class action is not permitted, Class members will continue to suffer losses, and DJI's misconduct will continue without a proper remedy.

63. DJI has acted and refused to act on grounds generally applicable to the entire Class, making final injunctive relief or corresponding declaratory relief appropriate for the Class.

**COUNT I**
**UNLAWFUL AND UNFAIR BUSINESS ACTS AND PRACTICES IN VIOLATION**
**of Cal. Bus. & Prof. Code §17200, et seq.**

64. Each of the above allegations is incorporated herein.

65. DJI's misrepresentations and omissions as to the 4K capability of the Cameras, as well as its failure to reasonably disclose the Defect, and wrongful warranty practices, were disseminated and directed from the United States headquarters of DJI in Los Angeles. Therefore, based upon the choice of law rules applied in this District, Plaintiffs preliminarily identify the substantive laws of California as the most likely to apply to the errors and omissions complained of herein.

66. The acts, practices, failures, and omissions of fact by DJI described above, and DJI's misleading marketing, constitute unlawful and unfair business acts and

practices as well as false and deceptive advertising within the meaning of California Business & Professions Code §17200, et seq.

67. DJI engaged in "unfair" business acts or practices by selling Cameras containing a Defect that negatively and materially impacted the Camera's merchantability and fitness for recording video in 4K/120fps.

68. DJI's unlawful and unfair business acts and practices present a continuing threat to Plaintiff, Class members, and the general public because DJI has refused to publicly acknowledge the Defect, correct its wrongdoing, recall the Cameras, or provide compensation for the damages it has caused to consumers.

69. Pursuant to California Business & Professions Code §17203, Plaintiffs, on behalf of themselves, the other Class members, and the general public, seeks an order of this Court enjoining DJI from withholding information regarding the Defect and continuing to market the Cameras as being capable of recording in 4K/120fps. Plaintiffs and the Class also seek restitution of any monies wrongfully acquired or retained by DJI and disgorgement of DJI's ill-gotten gains.

**COUNT II**
**UNTRUE AND MISLEADING ADVERTISING IN VIOLATION of Cal. Bus. & Prof. Code §17500, et seq.**

70. Each of the above allegations is incorporated herein.

71. California Business & Professions Code §17500 prohibits deceptive practices concerning representations to induce customers to purchase consumer products such as the Cameras.

72. DJI's acts, practices, misrepresentations, and omissions alleged herein were intended to, and did, induce the consuming public to purchase the Cameras and

violated and continue to violate Business & Professions Code §17500, in that DJI caused advertisements for its Cameras to be placed before the general public, even though the Cameras did not conform to the advertisements.

73. To redress DJI's misconduct, Plaintiff, the Class, and the general public are entitled to injunctive and equitable relief, including disgorgement and restitution of DJI's ill-gotten gains.

**COUNT III**
**VIOLATION OF THE SONG-BEVERLY CONSUMER WARRANTY ACT**
**(Cal. Civ. Code §1792 et seq.)**

74. Each of the above allegations is incorporated herein.

75. Under the Song-Beverly Consumer Warranty Act, DJI impliedly warranted to Plaintiffs that the Cameras were "merchantable" and fit for the purpose for which they were purchased. Cal. Civ. Code §§ 1791.1, 1792, and 1792.1.

76. The implied warranty was breached, however, when, as set forth above, the Cameras were sold with a Defect undiscoverable by the Plaintiffs and the Class members at the time of sale. As such, the Cameras were rendered unmerchantable by the existence of the Defect itself rather than when Plaintiffs and the Class members subsequently discovered the Defect. Had the Defect been known, the Cameras would have been unsalable as being capable of recording in 4K/120fps. In addition, under the Song-Beverly Consumer Warranty Act, DJI must make available replacement parts to effect repairs during the warranty period and repair defects within 30 days. Cal. Civ. Code §1793.2(a)(3) and (b).

77. DJI violated the Song-Beverly Consumer Warranty Act by failing to provide the effective repair or replacement of the defective Cameras within 30 days. As

provided by the Song Beverly Consumer Warranty Act, Plaintiff, on his behalf and on behalf of the Class, seeks reimbursement of the cost of the Cameras as well as an award of attorneys' fees.

**COUNT IV**
**UNLAWFUL PRACTICE IN THE SALE OF CONSUMER GOODS IN VIOLATION OF**
**THE CONSUMERS' LEGAL REMEDIES ACT**
**(Cal. Civ. Code §1750, et. seq.)**

78. Each of the above allegations is incorporated herein.

79. The Cameras described above were bought by Plaintiffs and other consumers similarly situated, primarily for personal, family, or household purposes. Prior to Plaintiffs' purchase of the Cameras, DJI violated California Civil Code §1770 in the following respects:

(a) In violation of California Civil Code §1770(a)(5), DJI failed to disclose that the Cameras were incapable of being used as represented;

(b) In violation of California Civil Code §1770(a)(7), DJI failed to disclose that the Cameras were not of a particular standard, grade, or quality, specifically that they could not record in high definition for any reasonable amount of time;

(c) In violation of California Civil Code §1770(a)(9), Despite the existence of the Defect, DJI advertised the Cameras as able to record in 4K, including in 4K/120 fps, to sell the Cameras to consumers at an inflated price.

80. The foregoing violations resulted from DJI's concealment from Plaintiffs and the Class of the Cameras' actual characteristics, uses, and qualities. DJI's

misrepresentations and omissions resulted in the sale of the Cameras to Plaintiffs and other consumers similarly situated. Had DJI not engaged in such misconduct, Plaintiffs and the Class would not have purchased the Cameras or would have paid less for the Cameras.

81. On October 16, 2025, Plaintiffs' counsel sent a letter to DJI by certified mail, return receipt requested, that contained a notice of DJI's violation of the California Consumers Legal Remedies Act and a demand for remedy by DJI. A true and correct copy of the letter is attached to this Complaint as Exhibit "1," the contents of which are incorporated herein by reference. The letter notified DJI of the violations of the California Civil Code that resulted in the sale of defective Cameras to Plaintiffs, and all others similarly situated, and demanded that DJI remedy the violations.

82. In this complaint, Plaintiffs limit their claims under the CLRA to injunctive relief. However, if more than 30 days pass from DJI's receipt of the notice letter and DJI fails to remedy its violations of the CLRA, Plaintiffs will amend their complaint to add claims for damages.

83. Pursuant to California Civil Code section 1780, Plaintiff, on behalf of themselves, the other Class members, and the general public, seek an order of this Court enjoining DJI from continuing the unlawful acts and practices regarding the Cameras.

**COUNT V**
**VIOLATION OF MAGNUSON-MOSS ACT (15 U.S.C. §2301 et seq.)**

84. Each of the above allegations is incorporated herein.

85. Plaintiffs and the Class are consumers as defined in 15 U.S.C. §2301(3).

86. DJI is a supplier and warrantor as defined in 15 U.S.C. §2301(4)(5).

87. The Cameras are consumer products as defined in 15 U.S.C. §2301(1).

88. By breaching its implied warranties and express written warranties concerning the Cameras, DJI violated the rights and protections due to the Plaintiffs and the Class under the Magnuson-Moss Warranty Act, 15 U.S.C. §2301 et seq., thereby damaging Plaintiffs and the Class.

**COUNT VI**
**UNJUST ENRICHMENT**

89. Each of the above allegations is incorporated herein.

90. Plaintiffs and the Class conferred a benefit on DJI by purchasing the Cameras. DJI had knowledge that this benefit was conferred upon it.

91. Because of its wrongful acts and omissions, DJI could charge a higher price than the actual value of the Cameras. By setting this unwarranted price premium for the Cameras, DJI obtained money that rightfully belongs to Plaintiffs and the Class and enriched itself at the expense of Plaintiffs and the Class.

92. DJI was and continues to be unjustly enriched at the expense of Plaintiffs and Class members.

93. DJI's retention (without an offsetting return payment) of the benefit that Plaintiffs and Class members conferred upon it would be unjust and inequitable. Plaintiffs and the Class are entitled to disgorgement of this benefit in an amount to be determined at trial.

**COUNT VII**
**BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY UNDER CALIFORNIA LAW**
**(**Cal. Com. Code §§ 2314, 2714–2715**)**

94. Each of the above allegations is incorporated herein.

95. DJI is and was at all relevant times a "merchant" with respect to cameras under the California Commercial Code.

96. Pursuant to California Commercial Code § 2314, a warranty that the Cameras were in merchantable condition was implied by law, and the Cameras were bought and sold subject to an implied warranty of merchantability.

97. The Cameras did not comply with the implied warranty of merchantability because, at the time of sale and at all times thereafter, they were defective and not in merchantable condition, would not pass without objection in the trade, and were not fit for the ordinary purpose for which 4K cameras were used. Specifically, the Cameras suffer from the Defect which causes the Cameras' to rapidly overheat when recording 4K video.

98. Defendant was provided notice of the Defect through numerous complaints submitted by consumers.

99. Plaintiffs and the class members suffered injuries due to the defective nature of the Cameras and DJI's breach of the implied warranty of merchantability.

100. As a direct and proximate result of DJI's breach of the implied warranty of merchantability, Plaintiffs and the other class members have been damaged in an amount to be proven at trial.

**COUNT VIII**
**BREACH OF EXPRESS WARRANTY UNDER CALIFORNIA LAW**
(Cal. Com. Code §§ 2313, 2713–2715)

101. Each of the above allegations is incorporated herein.

102. DJI is a "merchant" of cameras the California Commercial Code.

103. DJI warranted the Camera as a compact "4K" camera able to record video at up to 120 fps (frames per second). In addition, DJI warranted the Camera's battery life as being no less than 70 minutes, or up to almost three hours, with the "Front Touchscreen Module" or "Power Module."

104. DJI breached these warranties because the Cameras can only operate for a few minutes in 4K before they overheat and shut down due to the Defect.

105. Plaintiff relied on DJI's express warranties in purchasing the Cameras, and DJI's breach of its express warranties is a direct and proximate cause of Plaintiff's damages.

106. Pursuant to California Commercial Code §§ 2713–2715, Plaintiffs and the class are entitled to recover damages, including incidental and consequential damages.

**COUNT IX**
**VIOLATION OF THE CONNECTICUT**
**UNFAIR TRADE PRACTICES ACT**
**(Conn. Gen. Stat. §§ 42-110a et seq.)**
**(Brought by Plaintiff Robert Dunlap on Behalf of the Connecticut Subclass)**

107. Each of the above allegations is incorporated herein.

108. Plaintiff Dunlap brings this count individually and on behalf of the other members of the Connecticut Subclass.

109. The Connecticut Unfair Trade Practices Act, Conn. Gen. Stat. §§ 42-110a, et seq., prohibits "engag[ing] in unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce."

110. By the conduct described in detail above and incorporated herein, Defendant engaged in deceptive trade practices.

111. Defendant was provided notice of the Defect through numerous complaints submitted by consumers.

112. Defendant's misrepresentations and omissions regarding the Defect are material facts that a reasonable person would have considered in deciding whether or not to purchase (or pay the same price for) the Cameras.

113. Defendant intended for Plaintiff and the other Subclass members to rely on Defendant's misrepresentations and omissions regarding the Defect.

114. Plaintiff and the other Connecticut Subclass members justifiably acted or relied to their detriment upon Defendant's misrepresentations and omissions of fact concerning the Defect.

115. Had Defendant disclosed all material information regarding the Defect to Plaintiff and the other Connecticut Subclass members, Plaintiff and the other Subclass members would not have purchased the Camaras or would not have paid as much as they did for them.

116. Defendant's misrepresentations and omissions have deceived Plaintiff, and those same business practices have deceived or are likely to deceive members of the consuming public and the other members of the Subclass.

117. As a direct and proximate result of Defendant's deceptive trade practices, Plaintiff and the other Connecticut Subclass members have suffered ascertainable loss and actual damages.

118. Plaintiff and the other Subclass members are entitled to recover the actual damages, attorneys' fees and costs, and all other relief allowed under Conn. Gen. Stat. §§

42-110a, et seq.

**COUNT X**
**BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY UNDER CONNECTICUT LAW**
**(Conn. Gen. Stat. §§ 42a-2-314 and 42a-2a-504)**
**(Brought in the Alternative by Plaintiff Dunlap on Behalf of the Connecticut Subclass)**

119. Each of the above allegations is incorporated herein.

120. Plaintiff Dunlap brings this count individually and on behalf of the other members of the Connecticut Subclass.

121. DJI is and was at all relevant times a "merchant" with respect to cameras under C.G.S.A. §§ 42a-2-104 and 42a-2a-501.

122. Pursuant to C.G.S.A. §§ 42a-2-314 and 42a-2a-504, a warranty that the Cameras were in merchantable condition was implied by law, and the Cameras were bought and sold subject to an implied warranty of merchantability.

123. The Cameras did not comply with the implied warranty of merchantability because, at the time of sale and at all times thereafter, they were defective and not in merchantable condition, would not pass without objection in the trade, and were not fit for the ordinary purpose for which 4K cameras were used. Specifically, the Cameras suffer from the Defect which causes the Cameras' to rapidly overheat when recording 4K video.

124. Defendant was provided notice of the Defect through numerous complaints submitted by consumers.

125. Plaintiff and the other Subclass members suffered injuries due to the defective nature of the Cameras and Defendant's breach of the implied warranty of

merchantability.

126. As a direct and proximate result of Defendant's breach of the implied warranty of merchantability, Plaintiff and the other Subclass members have been damaged in an amount to be proven at trial.

**COUNT XI**
**BREACH OF EXPRESS WARRANTY UNDER CONNECTICUT LAW**
**Conn. Gen. Stat. Ann. § 42A-2-313**
**(Brought in the Alternative by Plaintiff Robert Dunlap on Behalf of the Connecticut Subclass)**

127. Each of the above allegations is incorporated herein.

128. Plaintiff Dunlap brings this count individually and on behalf of the other members of the Connecticut Subclass.

129. DJI is a "merchant" of cameras under 42a-2-104(1).

130. DJI warranted the Camera as a compact "4K" camera able to record video at up to 120 fps (frames per second). In addition, DJI warranted the Camera's battery life as being no less than 70 minutes, or up to almost three hours, with the "Front Touchscreen Module" or "Power Module."

131. DJI breached these warranties because the Cameras can only operate for a few minutes in 4K before they overheat and shut down due to the Defect.

132. Incidental and consequential damages allowed under Conn. Gen. Stat. Ann. §§ 42a-2-711 and 42a-2-608.

**COUNT XII**
**VIOLATION OF THE COLORADO CONSUMER PROTECTION ACT**
**(Col. Rev. Stat. § 6-1-101, et seq.)**
**(Brought in the Alternative by Plaintiff Anthony Smith on Behalf of the Colorado Subclass)**

133. Each of the above allegations is incorporated herein.

134. Plaintiff Anthony Smith brings this action on behalf of himself and the Colorado Subclass.

135. Defendant DJI is a "person" under § 6-1-102(6) of the Colorado Consumer Protection Act ("Colorado CPA"), Col. Rev. Stat. § 6-1-101, et seq.

136. Plaintiff and the Colorado Subclass members are "consumers" for purposes of Col. Rev. Stat § 6-1-113(1)(a) who purchased one or more Cameras.

137. The Colorado CPA prohibits deceptive trade practices in the course of a person's business. DJI engaged in deceptive trade practices prohibited by the Colorado CPA, including: (1) knowingly making a false representation as to the characteristics, uses, and benefits of the Cameras that had the capacity or tendency to deceive Colorado Subclass members; (2) representing that the Cameras are of a particular standard, quality, and grade even though DJI knew or should have known they are not; (3) advertising the Cameras with the intent not to sell them as advertised; and (4) failing to disclose material information concerning the Camera that was known to DJI at the time of advertisement or sale with the intent to induce Colorado Subclass members to purchase the Cameras.

138. Defendant thus violated the Colorado CPA by, at minimum: employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of the Cameras.

139. DJI's actions as set forth above occurred in the conduct of trade or commerce.

140. DJI intentionally and knowingly misrepresented material facts regarding the Cameras with intent to mislead Plaintiff and the Colorado Subclass.

141. DJI knew or should have known that its conduct violated the Colorado CPA.

142. Plaintiff and the Colorado Subclass suffered ascertainable loss and actual damages as a direct and proximate result of Defendant's misrepresentations and its concealment of and failure to disclose material information. Plaintiff and the Colorado Subclass members who purchased the Cameras would not have purchased them or would not have paid as much for them as they did, if the Defect had been disclosed.

143. Pursuant to Colo. Rev. Stat. § 6-1-113, Plaintiff, individually and on behalf of the Colorado Subclass, seek monetary relief against Defendant (a) in an amount to be determined at trial and discretionary trebling of such damages, or (b) statutory damages in the amount of $500 for each Plaintiff and each Colorado Subclass member.

144. Plaintiff also seek an order enjoining Defendant's unfair, unlawful, and/or deceptive practices, declaratory relief, attorneys' fees, and any other just and proper relief available under the Colorado CPA.

**COUNT XIII**
**BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY UNDER COLORADO LAW**
**(Col. Rev. Stat. §§ 4-2-313 and 4-2.5-212)**
**(Brought in the Alternative by Plaintiff Anthony Smith on Behalf of the Colorado Subclass)**

145. Each of the above allegations is incorporated herein.

146. Plaintiff Anthony Smith brings this Count on behalf of the Colorado Subclass.

147. DJI is and was at all relevant times a "merchant" with respect to cameras

under Colo. Rev. Stat. §§ 4-2-104(1) and 4-2.5-103(3), and a "seller" of cameras under § 4-2-103(1)(d).

148. The Cameras are and were at all relevant times "goods" within the meaning of Colo. Rev. Stat. §§ 4-2-105(1) and 4-2.5-103(1)(h).

149. A warranty that the Cameras were in merchantable condition and fit for the ordinary purpose for which 4K cameras are used is implied by law pursuant to Colo. Rev. Stat. § § 4-2-313 and 4-2.5-212).

150. When sold, and at all times thereafter, the Cameras were not in merchantable condition and were not fit for the ordinary purpose for which 4K Cameras are used.

151. Specifically, the Cameras are inherently defective in that they rapidly overheat when recording 4K video and shut down.

152. DJI was provided notice of these issues by numerous complaints from consumers including the instant Complaint, and by numerous individual emails and communications sent by consumers.

153. As a direct and proximate result of DJI's breach of the implied warranty of merchantability, Plaintiff and the other Colorado Subclass members have been damaged in an amount to be proven at trial.

**COUNT XIV**
**BREACH OF EXPRESS WARRANTY UNDER COLORADO LAW**
**(Colo. Rev. Stat. §§ 4-2-313 and 4-2.5-210)**
**(Brought in the Alternative by Plaintiff Anthony Smith on Behalf of the Colorado Subclass)**

154. Each of the above allegations is incorporated herein.

155. Plaintiff brings this Count on behalf of the Colorado Subclass.

156. DJI is and was at all relevant times a "merchant" with respect to cameras under Colo. Rev. Stat. §§ 4-2-104(1) and 4-2.5-103(3), and a "seller" of cameras under § 4-2-103(1)(d).

157. The Cameras are and were at all relevant times "goods" within the meaning of Colo. Rev. Stat. §§ 105(1) and 4-2.5-103(1)(h).

158. Defendant expressly warranted that the Camera could record 4K video at up to 120 fps (frames per second). In addition, DJI advertised the Camera's battery life as being no less than 70 minutes, or up to almost three hours, with the "Front Touchscreen Module" or "Power Module." Further, by using the word "Action" in the name and description of the product, the Cameras were represented as being suitable for capturing "action" scenes in 4K at a frame rate of 120 fps.

159. Defendant breached these warranties by selling Cameras with the Defect to Plaintiff and members of the Colorado Subclass.

160. These warranties formed a basis of the bargain that was reached when Plaintiff and other Colorado Subclass members purchased their Cameras which contained the Defect.

161. Plaintiff and the Colorado Subclass members experienced defects within the warranty period. Despite the existence of warranties, DJI failed to inform Plaintiff and Colorado Subclass members of the Defect.

162. DJI has not repaired or adjusted, and has been unable to repair or adjust, the Cameras' materials and workmanship defects.

163. Affording DJI a reasonable opportunity to cure its breach of written warranties would be unnecessary and futile here.

164. DJI has attempted to ameliorate the Defect by increasing the amount of heat the Cameras generate before they shut off and providing consumers a case to place the Cameras in during use, so consumers do not burn their hands.

165. However, this attempt did not materially increase the amount of time consumers could record in 4K before the Cameras overheated.

166. Also, as alleged in more detail herein, at the time DJI sold the Cameras they knew that the Cameras were inherently defective and did not conform to its warranties. In addition, DJI wrongfully and fraudulently concealed material facts regarding the Cameras. Plaintiff Smith and the other Colorado Subclass members were therefore induced to purchase the Cameras under false and/or fraudulent pretenses.

167. Because of DJI's breach of warranty as set forth herein, Plaintiff and the other Colorado Subclass members assert, as additional and/or alternative remedies, the revocation of acceptance of the goods and the return to Plaintiff and the other Colorado Subclass members of the purchase price of the Camera and for such other incidental and consequential damages as allowed.

**COUNT XV**
**VIOLATION OF NEW YORK GENERAL BUSINESS LAW § 349**
**(Brought in the Alternative by Plaintiff Miguel Soto on behalf of the New York Subclass)**

168. Each of the above allegations is incorporated herein.

169. New York General Business Law Section 349 declares unlawful "[d]exceptive

acts or practices in the conduct of any business, trade, or commerce or in the furnishing of any service in this state . . ."

170. The conduct of Defendant alleged herein constitutes recurring unlawful deceptive acts and practices in violation of Gen. Bus. Law §349, and as such, Plaintiff Soto and the New York Subclass seek monetary damages and the entry of preliminary and permanent injunctive relief against Defendant, enjoining it from inaccurately describing, marketing, and promoting the Cameras.

171. Defendant DJI advertised the Camera as a compact "4K" camera able to record video at up to 120 fps (frames per second). In addition, DJI advertised the Camera's battery life as being no less than 70 minutes, or up to almost three hours, with the "Front Touchscreen Module" or "Power Module," reasonably implying to consumers that the Cameras could operate for these lengths of time. Further, as indicated by using the word "Action" in the name and description of the product, the Cameras were represented as being suitable for capturing "action" scenes in 4K at a frame rate of 120 fps.

172. DJI's representations were misleading and inaccurate. Because of the Defect, the Cameras can only record video content in 4K for a few minutes before they overheat and shut down. Not only does DJI not disclose this limitation, but DJI attempts to conceal the Defect by promoting how the Camera's battery life and memory capacity allow long recording times, which are rendered impossible due to the Defect. Specifically, DJI represents that the Cameras have a battery life of up to 70 minutes with just the internal battery.

173. Defendant willfully violated Gen. Bus. Law §349 by selling the Cameras

without disclosing the Defect.

174. Defendant's misrepresentations and omissions as set forth in this complaint are material in that they relate to matters that are important to consumers and/or are likely to affect the purchasing decisions or conduct of consumers, including Plaintiff and the New York Subclass.

175. In violation of Gen. Bus. Law §349, Defendant employed fraud, deception, false promise, misrepresentation and/or the knowing concealment, suppression or omission of material facts in its sale and advertisement of the Cameras.

176. Plaintiff and the New York Subclass suffered an ascertainable loss as a result of Defendant's unlawful conduct as alleged herein.

177. Had Plaintiff known the truth about the Cameras, he would not have purchased the Camera or would not have paid as much for them as he did.

178. As a result of Defendant's recurring, unlawful deceptive acts and practices, Plaintiff and New York Subclass Members are entitled to monetary, compensatory, treble and punitive damages, injunctive relief, restitution and disgorgement of all moneys obtained by means of Defendant's unlawful conduct, interest, and attorneys' fees and costs.

**COUNT XVI**
**VIOLATION OF NEW YORK GENERAL BUSINESS LAW § 350**
**(Brought in the Alternative by Plaintiff Miguel Soto on behalf of the New York Subclass)**

179. Each of the above allegations is incorporated herein.

180. N.Y. Gen. Bus. Law § 350 provides, in part, as follows: "False advertising

in the conduct of any business, trade or commerce or in the furnishing of any service in this state is hereby declared unlawful."

181. N.Y. Gen. Bus. Law § 350(a)(1) provides, in part, as follows: The term 'false advertising, including labeling, of a commodity, or of the kind, character, terms or conditions of any employment opportunity if such advertising is misleading in a material respect. In determining whether any advertising is misleading, there shall be taken into account (among other things) not only representations made by statement, word, design, device, sound or any combination thereof, but also the extent to which the advertising fails to reveal facts material in the light of such representations with respect to the commodity or employment to which the advertising relates under the conditions proscribed in said advertisement, or under such conditions as are customary or usual . . .

182. Defendant's labeling and advertisements contain untrue and materially misleading statements concerning the length of time the Camera can record video in 4K. Defendant stated that DJI advertised the Camera as a compact "4K" camera able to record video at up to 120 fps (frames per second).

183. In addition, DJI advertised the Camera's battery life as being no less than 70 minutes, or up to almost three hours, with the "Front Touchscreen Module" or "Power Module," reasonably implying to consumers that the Cameras could operate for these lengths of time. Further, as indicated by using the word "Action" in the name and description of the product, the Cameras were represented as being suitable for capturing "action" scenes in 4K at a frame rate of 120 fps.

184. DJI's representations were misleading and inaccurate. Because of the Defect, the Cameras can only operate for a few minutes in 4K before they overheat and

shut down. Not only does DJI not disclose this limitation, but DJI attempts to conceal the Defect by promoting how the Camera's battery life and memory capacity allow long recording times, which are rendered impossible due to the Defect. Specifically, DJI represents that the Cameras have a battery life of up to 70 minutes with just the internal battery.

185. Plaintiff and the members of the New York Subclass have been injured inasmuch as they relied upon the Defendant's advertising and received less than what they bargained and/or paid for.

186. Defendant's advertising induced Plaintiff and New York Subclass members to buy the Cameras.

187. Defendant made its untrue and/or misleading statements and representations willfully, wantonly, and with reckless disregard for the truth.

188. Defendant's conduct constitutes multiple, separate violations of N.Y. Gen. Bus. Law § 350.

189. Defendant's material misrepresentations were substantially uniform in content, presentation, and impact upon consumers at large. Moreover, all consumers purchasing the Products were and continue to be exposed to Defendant's material misrepresentations.

190. As a result of Defendant's recurring, unlawful deceptive acts and practices, Plaintiff and the members of the New York Subclass are entitled to monetary, compensatory, treble and punitive damages, injunctive relief, restitution and disgorgement of all moneys obtained by means of Defendant's unlawful conduct, interest, and attorneys' fees and costs.

**COUNT XVII**
**BREACH OF EXPRESS WARRANTY UNDER NEW YORK LAW**
**(N.Y. U.C.C. Law §§ 2-313 and 2A-210)**
**(Brought in the Alternative by Plaintiff Miguel Soto on behalf of the New York Subclass)**

191. Each of the above allegations is incorporated herein.

192. Defendant was at all relevant times a "merchant," and/or "seller" under N.Y. U.C.C. Law §§ 2-103(1)(d), 2-104(1) and 2A-103(1)(p).

193. Defendant expressly warranted that the Camera could record 4K video at up to 120 fps (frames per second). In addition, DJI advertised the Camera's battery life as being no less than 70 minutes, or up to almost three hours, with the "Front Touchscreen Module" or "Power Module." Further, by using the word "Action" in the name and description of the product, the Cameras were represented as being suitable for capturing "action" scenes in 4K at a frame rate of 120 fps.

194. Defendant breached these warranties by selling to Plaintiff and members of the New York Subclass Cameras with the Defect.

195. As a result of the Defendant's actions, Plaintiff and members of the New York Subclass have suffered economic damages, including but not limited to substantial loss in value and resale value, and other related damage.

196. Defendant's attempt to disclaim or limit these express warranties is unconscionable and unenforceable under the circumstances here. Specifically, Defendant's warranty limitations are unenforceable because it knowingly sold Cameras without informing consumers about the Defect. Furthermore, Defendant has failed to repair the Defect.

197. A gross disparity in bargaining power existed between DJI and members of the New York Subclass, and DJI knew or should have known that the Cameras were defective at the time of sale.

198. Plaintiff and New York Subclass members have complied with all obligations under the warranties or otherwise have been excused from performance of such obligations as a result of Defendant's conduct.

199. Defendant was notified of their breach by numerous consumer complaints and communications by New York Subclass Members.

200. As a direct and proximate result of the breach, Plaintiff and the Members of the New York Subclass have been damaged in an amount to be determined at trial.

**COUNT XVIII**
**Breach of Implied Warranty of Merchantability Under New York Law**
**(N.Y. U.C.C. Law §§ 2-314 and 2A-212)**
**(Brought in the Alternative by Plaintiff Miguel Soto on behalf of the New York Subclass)**

201. Each of the above allegations is incorporated herein.

202. Defendant was at all times a "merchant" and/or "seller" under N.Y. U.C.C. Law §§ 2-103(1)(d), 2-104(1) and 2A-103(1)(p).

203. An implied warranty of merchantability arises under New York law under N.Y. U.C.C. Law §§ 2-314 and 2A-212.

204. The Cameras, when sold and at all times thereafter, were not in merchantable condition and are not fit for the ordinary purpose for which the Cameras were used. Specifically, the Cameras are inherently defective in that they quickly overheat and become unusable when recording video in 4K. Accordingly, the Cameras do not function properly, are prone to premature failure, are not of sufficient quality

when sold.

205. Defendant was provided notice of these issues by numerous complaints filed against them, including the instant Complaint.

206. As a direct and proximate result of the Defendant's breach of the implied warranty of merchantability, Plaintiff and the New York Subclass have been damaged in an amount to be determined at trial.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff respectfully requests that this Court enter judgment as follows:

A. Declaring that this action is properly maintainable as a class action and certifying Plaintiff as Class representative;

B. Awarding damages in an amount to be determined at trial;

C. Awarding restitution and disgorgement as a result of DJI's unfair business practices and untrue and misleading advertising;

D. Enjoining the defendants from continuing the illegal practices set out above;

E. Awarding pre-judgment and post-judgment interest;

F. Awarding attorney fees, expenses, and costs; and

G. Providing such other and further relief as this Court may deem just and proper.

## JURY DEMAND

Plaintiffs demand a trial by jury.

Dated: October 16, 2025

Respectfully submitted,

Daniel E. Sobelsohn

Daniel E. Sobelsohn
daniel@sobelsohnlawfirm.com
THE SOBELSOHN LAW FIRM
21550 Oxnard Street
Suite 480
Woodland Hills, CA 91367
Tel: (818) 722-8995

Robert I. Lax
(*pro hac vice* forthcoming)
rlax@lax-law.com
Lax LLP
380 Lexington Ave.
31st Floor
New York, NY 10168
Tel: (212) 818-9150

Adam R. Gonnelli
(*pro hac vice* forthcoming)
adam@arglawoffice.com
Law Office of Adam R. Gonnelli LLC
707 Alexander Rd., Building 2, Suite 208
Princeton, NJ 08540
Tel: (917) 541-7110

Don Bivens (*pro hac vice* forthcoming)
don@donbivens.com
DON BIVENS PLLC
15169 N. Scottsdale Road, Suite 205
Scottsdale, AZ 85254
Telephone: (602) 762-2661

Attorneys for Plaintiffs